UNITED STATED DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RODERICK GILMORE,
    PETITIONER,

        v.                      CIVIL ACTION NO. 05-10127-PBS

LUIS SPENCER,
    RESPONDENT.

PETITIONER'S MEMORANDUM IN SUPPORT OF
PETITION FOR HABEAS CORPUS

Statement of the Case

On March 29, 1994, a Plymouth County Grand Jury returned
indictments against the petitioner, Roderick Gilmore charging him
with having committed the crime of Murder in the first degree
(Indictment No. 95245) (R. 1), M.G.L. c. 265, § 1. The
petitioner was arraigned in Plymouth Superior Court on May 3,
1994, and entered a not guilty plea on the charge. (R. 1).

On March 7, 1995, a jury trial commenced before the
Honorable Robert Steadman. The case went to the jury on March 8,
1995, on the aforementioned indictment. (R. 3). The jury
returned a guilty verdict in the second degree of murder, on
March 9, 1995. (R. 3)   On March 9, 1995, the petitioner received
a life sentence to M.C.I. Cedar Junction. (R. 3).

The defendant filed an appeal on March 15, 1995 (R. 3) and
the case was docketed in the Appeals Court on September 13, 1996
as 96-P-1435 (R. 6). The petitioner filed an Application for
Leave to Obtain Further Appellate Review. (R.229). The Supreme
Judicial Court denied the petitioner's motion on April 1, 2004.

(R.247). On May 13, 2004, the petitioner filed the subject
federal habeas corpus petition in the United States District
Court, District of Massachusetts, which was not filed thereafter
in January, 2005.

### Statement of Facts

The one-day trial began on March 7, 1995, in Plymouth
Superior Court before the Honorable Robert Steadman.

The Commonwealth's case against the petitioner consisted of
the following eighteen year old petitioner rode his bicycle over
to his friend Christina Arsenault's house around 1:00 a.m. on
November 14, 1993. (Tr. 2: 114-116). The petitioner left his
bicycle in her backyard and spent the night in the house. (Tr. 2:
116). Christina and the petitioner awoke around 12:30 p.m. on
November 14, 1993. (Tr. 2: 117). At the request of Debra Vodden,
Christina's mother, the petitioner left the house. (Tr. 2: 180).

Petitioner walked to the back yard and discovered that his
bicycle was missing. (Tr. 2: 180, 182-83). He asked a few people
if they had seen it, but no one knew what he was talking about
(Tr. 2: 180). He returned to Christina's house and told her that
someone had stolen his bicycle (Tr. 2: 118, 181). While they were
talking, Christina saw Enrique Torres ride by on the Petitioner's
bicycle (Tr. 2: 118). She said to petitioner, "there goes your
bike right there," and called to Torres to come back (Tr. 2:
119-120). Instead, Torres rode the bicycle to the front door of
11 Park Street and brought the bike inside (Tr. 1: 105; Tr. 2:
120, 181).

2

Petitioner followed Torres into the apartment building (Tr. 1:105; Tr. 2: 181). He found Torres bent over the bicycle, making some kind of adjustment with a screwdriver  in hand. (Tr. 2: 181-182).  The bicycle's speedometer, water bottle, and reflector had all been removed. (Tr. 2: 183).  Petitioner informed Torres that the bicycle was his and he wanted it back (Tr. 2: 181-82).

Torres first claimed that the bicycle belonged to him (Tr. 2: 182), he changed his story when Petitioner indicated that he had papers proving his ownership of the bike. (Tr. 2: 182). Torres then claimed that he had found the bicycle in the backyard and "fixed it up." (Tr. 1: 107; Tr. 2: 182).

Torres was 28 years old, 5'11" tall, and weighed approximately 220 pounds. (Tr. 1: 84; Tr. 2: 93).  In contrast, Petitioner was only 18 years old, 5'10" tall, and weighed approximately 160 pounds. (Tr. 1: 102; Tr. 3: 32). After this admission, Petitioner turned and left (Tr. 1: 108; Tr. 2: 124, 181). Torres followed Petitioner, screaming profanities (Tr. 2: 192), which Petitioner returned in kind (Tr. 2: 190-192). Torres then told Petitioner that he could have the bicycle for $20 (Tr. 2: 127, 183). Petitioner laughed and told Torres he wasn't going to pay for his own bicycle (Tr. 2: 183). Petitioner continued walking away, but turned back to say something else (Tr. 1: 108; Tr. 2: 127, 183).

Without warning, Torres punched Petitioner in the head (Tr. 1: 108, 158, 187; Tr. 2: 127). While accounts varied as to the strength of the blow, one witness testified that he felt the

3

punch's impact, even though he was standing across the street.
(Tr. 1: 158). Petitioner stepped back a bit, he was "shocked"
(Tr. 1: 109; Tr. 2: 183, 194).  Petitioner did not at this point
know if Torres still had the screwdriver he had been using to
"fix" the bike (Tr. 2: 182). While Torres continued to come
straight at Petitioner, petitioner stabbed Torres twice "in the
heat of action" (Tr. 1: 110); Tr. 2: 184, 194-196). Christina 's
brother Russell raced up and pulled Petitioner away from Torres.
(Tr. 1: 111-112). Christina screamed for Petitioner to leave (Tr.
1: 110-112), and the two left. (Tr. 1: 112; Tr. 2: 130).

Enrique Torres died in Brockton Hospital that night. (Tr. 2:
84). The cause of death was internal bleeding from two stab
wounds, one to the abdomen, and the other to the back. (Tr. 2:
95, 100, 106).

### Defendant's Case

Christina Arsenault was called as witness for the defense.
She testified that she is a friend of the petitioner, she
identified him as the defendant in Court (Tr. 2: 114). She
testified that she was standing in the driveway, when she saw
Torres ride by with the Petitioner's bicycle (Tr. 2: 118). Torres
rode to a nearby house and carried the bicycle inside. The
Petitioner spoke to Torres in the hallway. She testified that the
door to Torres' hallway was wide open. Torres had something in
his hands fixing the bicycle (Tr. 2: 120-121). She heard Torres
and Gilmore arguing about the bicycle on Torres' front porch. She
could not see Petitioner because she was putting her laundry in

4

her mother's car, but she mostly heard them (Tr. 2: 123-26).
Torres did not want to give the bicycle up (Tr. 2: 121).   When
they were on the front porch, the bicycle remained in Torres'
house (Tr. 2: 122). Petitioner accused Torres of stealing the
bicycle from the backyard. Torres told Petitioner its not your
bicycle, I found it and fixed it. Petitioner left and Torres
followed him to the top of the driveway (Tr. 2: 123-126).
Christina's mother was standing within the fenced area in front
of the house (Tr. 2: 125).  At the gate Torres told Petitioner to
give him $20 and he could have the bicycle back. Petitioner said
you stole my bicycle (Tr. 2: 127).   Torres swung at Petitioner
and petitioner backed away as if hit (Tr. 2: 128). They started
arguing again. Torres did not back off. He came up to petitioner,
"coming up into his face" and Petitioner swung at Torres (Tr. 1:
129). Torres backed up a bit. Petitioner got in the car and left
with her (Tr. 2: 130).  Christina testified that she saw Roberto
Rivera standing by his house, diagonally across the street. She
testified that Roberto Rivera could not have seen Torres and
Petitioner because the trees and fence blocked his view (Tr. 2:
130-32).

     The petitioner testified that some lady told them to get out
of the house, so they went out on the porch. (Tr. 2: 182). There
they continued to argue about the bike. (Tr. 1: 106; Tr. 2: 121).
The petitioner told the victim he had papers for the bike (Tr. 2:
182). According to the petitioner the victim claimed that he had
papers for the bike (Tr. 2: 182). The victim also said that he
had found the bike, fixed it, and cleaned it up. (Tr. 1: 107; Tr.
2: 123, 182).

The petitioner testified that the victim did not have anything in his hands while they were on the porch. (Tr. 2: 189). He also said that he had been angry at the victim and just thought it was funny as the victim kept changing his story. (Tr. 2: 187). The petitioner and Christina testified that the victim then offered to give the petitioner the bicycle for $20.00. (Tr. 2: 127, 183). The petitioner turned back and there was some more swearing and arguing (Tr. 1: 116, 157-58, 183). The petitioner testified that after the victim hit him he was 'shocked.' (Tr. 2: 183). The victim hit the petitioner a second time, but the second punch did not really connect. (Tr. 1: 126; Tr. 2: 184).

The petitioner testified that he just happened to have his hand on his knife in his pocket when the victim hit him. (Tr. 2: 184, 193-94). The petitioner testified that when the victim was coming at him again, he just thrust forward twice, (Tr. 2: 184, 193), although petitioner admitted he stabbed the victim a couple of times, he claimed it all happened so fast he did not have time to think. (Tr. 2: 194-95, 197, 202-203). Petitioner denied intending to kill the victim (Tr. 203).

Issues

1.   Whether the Petitioner is entitled to relief under 28 U.S.C. § 2254, because the Commonwealth had failed to prove excessive use of force in self-defense to reduce the verdict to manslaughter?

2.   Whether the Petitioner is entitled to relief under 28 U.S.C.

6

§ 2254 because the petitioner was denied effective assistance of
counsel guaranteed by the Sixth Amendment of the United States
Constitution, by his counsel's failure to object to erroneous
instructions; failure to articulate one defense and failure to
use another allied and available defense; failure to impeach a
crucial witness; failure to object to improper "Sympathy"
evidence; and by counsel's calling a witness either without
knowing what her testimony would be or for manifesting
unreasonable purpose?

3.    Whether the petitioner is entitled to relief under 28 U.S.C.
§ 2254 because the prosecution statements of sympathy for the
victim was highly improper?

4.    Whether the petitioner is entitled to relief under 28 U.S.C.
§ 2254 because his conviction was obtained by the
unconstitutional failure to the prosecution to disclose to the
defendant, evidence favorable to the defendant?


<u>Argument</u>


I.    **STANDARD OF HABEAS COURT REVIEW UNDER 18
      U.S.C. 2254(D)(1).**

18 U.S.C. § 2254(d)(1) provides in pertinent part:

(d) An application for a writ of habeas corpus  on behalf of
a person in custody pursuant to the judgment of a State
Court shall not be granted with respect to any claim that
was adjudicated on the merits in State court proceedings
unless the adjudication of the claim-

      (1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the
United States. . . .

This provision was construed by the First Circuit in O'Brien v. Dubois, 145 F. 3d 16 (1st Cir. 1998), outlining a two-step analysis: First, the habeas court must ask whether the Supreme Court has prescribed a rule that governs the petitioner's claim. Id. If so, then the court must then determine if the state court decision is contrary to the governing rule. Id, If no dispositive rule exists, 1/ then the habeas court moves on to the second step of the analysis. O'Brien, 145 F. 3d at 24.

Under the second step, the habeas court must determine if the state court's use of, or failure to use, the existing law was of unreasonable application of Supreme Court precedent."2/   Id. The First Circuit held that an unreasonable application is one that is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." O'Brien, 145 F. 3d at 25.

---

1/ The Court indicated that a key inquiry in the above two-step analysis would be "how specific a [Supreme Court] rule must be to qualify as dispositive." O'Brien, 145 F. 3d at 24-25. It concluded that a "factually identical precedent was not necessary," and often times Supreme Court holdings, general in their scope, "erecting a framework specifically intended for application to variant factual situations," were sufficient for use under the contrary to prong of the analysis. id. at 25.

2/It should be noted that the inferior federal court jurisprudence is not rendered irrelevant when determining whether a state court's application of clearly established federal law is reasonable. O'Brien, 145 F. 3d at 21. However, this role cannot be used to circumvent the provision express prohibition on grounding habeas relief in rules created by the lower federal courts. Id.

The claim of error asserted by this petitioner all falls within the O'Brien ambit: existing Supreme Court precedent clearly requires an outcome contrary to the state court findings. As such, the petitioner is entitled to habeas relief.

## II.    WHETHER THE PETITIONER IS ENTITLED TO RELIEF UNDER 28 U.S.C. § 2254, BECAUSE THE COMMONWEALTH HAD FAILED TO PROVE EXCESSIVE USE OF FORCE IN SELF-DEFENSE TO REDUCE THE VERDICT TO MANSLAUGHTER.

Prior to this case being turned over to the jury, the trial court instructed the jury on the elements of first degree and its lesser included offenses, second degree murder and manslaughter (Tr. 3: 72-88). The court instructed the jury that if they had a reasonable doubt whether the petitioner acted in self-defense that they should acquit him, and

> [i]f the Commonwealth has failed to prove beyond a reasonable doubt the defendant did not act in self-defense, but the Commonwealth does prove beyond a reasonable doubt that the defendant used excessive force in defending himself. . ., then you may find the defendant guilty of a lesser included offense of manslaughter. (Tr. 3: 83).

Subsequently, the Court instructed the jury that in order to reduce murder to manslaughter, [t]he Commonwealth has the burden to prove beyond a reasonable doubt that the petitioner killed the deceased by use of excessive force in self-defense" (Tr. 3: 87). After the conclusion of the charge, at side bar, defense counsel questioned the Court about the self-defense charge as applied to manslaughter. Specificially, defense counsel asked the court whether the Court thought the instruction of self-defense as it applied to manslaughter was clear because the court only used the

self-defense instruction when discussing murder, not manslaughter
(Tr. 3: 90). Subsequent to the side bar conference, the court
gave the jury a supplemental instruction in which he repeated
that, in order to reduce murder to manslaughter "the Commonwealth
has a burden to prove beyond a reasonable doubt that the
defendant killed the deceased by use of excessive force in
self-defense." (Tr. 3: 91).

The latter two instructions were error because they require
the mitigating circumstance of excessive self-defense to be
affirmatively prove beyond a reasonable doubt as the prerequisite
for manslaughter. See Commonwealth v. Torres, 420 MAss. 479,
488-89 (1995). Herein, the erroneous instructions were magnified
by the fact that they were given to the jury as clarifications of
the original instructions. In other words, as the jurors were
wrestling with the issue, the court misdirected it from a proper
enunciation of the law to an erroneous one, then emphasized the
error by repeating it.

Although, defense counsel did not object specificially to
the challenged instruction, the court on a motion for new trial
must determine whether "it appears that justice may not have been
done," (emphasis added) Mass. R. Crim. P. 30(b), Commonwealth v.
Gagliardi, 21 Mass. App. Ct. 439, 448, and not whether the
challenged instruction created a "substantial likelihood of a
miscarriage of justice." See Commonwealth v. Torres, 420 Mass.
479, 483 (1995), quoting Commonwealth v. Eagles, 419 Mass. 825,
834 (1995). In Torres, the trial court had mingled correct with
incorrect instructions regarding the mitigating circumstances of

heat of passion. The Supreme Judicial Court held that the trial
court misstated the law when it instructed that "in order to
prove the petitioner guilty of voluntary manslaughter, the
Commonwealth must . . .[that] the petitioner injured the victim
as a result of a sudden combat or in the heat of passion."
Torres, 420 Mass. at 498. The Supreme Judicial Court, however,
held that the one incorrect instruction did not create a
substantial likelihood as to the prosecution's burden and the
defendant's presumption of innocence." Id. at 491. The Supreme
Court stated that the jury could not have concluded that the
trial court's one misstatement relieved the state of its burden
of persuasion beyond a reasonable doubt of every element of the
crime. Id. at 488.

       In the present case, the Court gave the correct instruction
in the first instance only. The two subsequent emphasized
instruction were incorrect. Given that the erroneous instruction
followed defense counsel's request for clarification, the jury
must have believed that the clarifications, which was the same as
the previous erroneous instruction on self-defense, must be
accurate. Unlike the Supreme Court in Torres, the jury in this
case could have only concluded that in order to reduce murder to
manslaughter, the defendant had to prove the mitigating
circumstance of excessive self-defense. At a minimum, justice may
not have been done, Mass. R. Crim. P. 30(b), and in fact the
incorrect instruction created a substantial likelihood of a

miscarriage of justice. The petitioner should be granted a new trial.

Under Article XII of the Massachusetts Declaration of Rights, a jury instruction unconstitutionally diminishes the Commonwealth's burden of proof when "a reasonable juror could have used the instructions incorrectly." Commonwealth v. Anderson, 425 Mass. 685, 688 (1997). In Acevedo, 427 Mass. at 717, the Court focused on "the center of gravity of the provocation instructions" in order to determine whether the burden of proof had been shifted in a manner that was impermissibly prejudicial to the defendant.

More generally, erroneous jury instructions should not be viewed in isolation, but rather in the context of the charge as a whole. Francis v. Franklin, 471 U.S. 307, 315 (1985); Commonwealth v. Trapp, 423 Mass. 356, 361 (1996). Subsequently, in Commonwealth v. Torres, 434 Mass. 1105, (2001); and Commonwealth v. Niemic, 427 Mass. 718 (1998), the Court sustained the conviction where one or more incorrect instructions concerning the burden of proof on provocation were sandwiched between instructions that properly stated the Commonwealth's obligation.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution "protects the accused against conviction except upon the proof beyond reasonable doubt of every fact necessary to constitute the crime with which he is charged." In Re Winship, 397 U.S. 358, 364 (1970); see also Sullivan v. Louisiana, 508 U.S. 275, 277-78 (1993). A presumption that shifts the burden of proof to the defendant on an element of the offense

violates the Fourteenth Amendment's requirement that the state
prove every element of a criminal offense beyond a reasonable
doubt. Sandstorm v. Montana, 442 U.S. 510, 524 (1979).

The Supreme Court has held that under the United States
Constitution's Due Process Clause, a jury instruction
impermissibly lowers the prosecution's burden of proof where
there is a "reasonable likelihood" that the jury used an
inappropriate standard. Estelle v. McGuire, 502 U.S. 62, 72 n.4
(1991). Also see Boyde v. California, 494 U.S. 370, 378 (1990).
In homicide cases, "the Due Process Clause requires the
prosecution to prove beyond a reasonable doubt the absence of
hear of passion on sudden provocation when the issue is properly
presented." Mullaney v. Wilbur, 421 U.S. 684, 704 (1975).

The testimony in this case raised the possibility that the
petitioner may have acted on reasonable pro98cation. The victim
was an older and taller male weighing approximately 220 pounds
charging upon the petitioner's 160 pounds with curses and
punches, especially after he had struck the petitioner and the
petitioner indicated that he was 'shocked.' (T. Tr. 1: 158, 187;
2: 190-192). In this case, as in Acevedo, 427 Mass. at 717, "the
judge's last word on the subject [of provocation], was not
ambivalent, it was wrong and could only have misled." If the
Court believes that the error materially influenced the result of
the trial, then there is a substantial risk of a miscarriage of
justice. LeFave, 430 Mass. at 174. After evaluating the
instructions as a whole, and looking for the interpretation that

a reasonable juror would have placed on the judge's words Francis v. Franklin, 471 U.S. at 315, it becomes evident that the final, lengthy and erroneous provocation instruction resulted in an unconstitutional and substantial likelihood of a miscarriage of justice, therefore the petitioner is entitled to relief sought in his petition for writ of habeas corpus.

III.   WHETHER THE PETITIONER IS ENTITLED TO RELIEF UNDER 28 U.S.C.
       § 2254, BECAUSE THE PETITIONER WAS DENIED EFFECTIVE
       ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AMENDMENT OF
       THE UNITED STATES CONSTITUTION, BY HIS COUNSEL'S FAILURE TO
       OBJECT TO ERRONEOUS INSTRUCTIONS; FAILURE TO OBJECT TO
       ERRONEOUS INSTRUCTIONS; FAILURE TO ARTICULATE ONE DEFENSE
       AND FAILURE TO USE ANOTHER ALLIED AND AVAILABLE DEFENSE;
       FAILURE TO IMPEACH A CRUCIAL WITNESS; FAILURE TO OBJECT TO
       IMPROPER "SYMPATHY" EVIDENCE; AND BY COUNSEL'S CALLING A
       WITNESS EITHER WITHOUT KNOWING WHAT HER TESTIMONY WOULD BE
       OR FOR MANIFESTING UNREASONABLE PURPOSE.

       A.   Defense counsel failed to object to the Court's
            erroneous jury instruction on "excessive use of force in
            self-defense."

The standard of review for which is governed by Strickland

v. Washington, 466 U.S. 668 (1984). This standard has been found

to be the same for both trial and appellate counsel. Id.

Strickland posits a two-pronged test for constitutional

challenges to the waiver rule. First, the defendant must show

that "counsel's performance was deficient" in that "counsel made

errors so serious that counsel was not functioning as the

'counsel' guaranteed the petitioner by the Sixth Amendment."

Strickland, 466 U.S. at 687. Second, the defendant must show that

the deficient performance prejudiced the defense in that

"counsel's errors were so serious as to deprive the petitioner of

a fair trial, a trial whose result is reliable." Id.

Federal Courts, in addressing the issue of appellate

counsel's effectiveness under the Strickland's standard, have

focused upon whether appellate counsel "'failed to raise a

significant and obvious issue . . . which  . .  may have resulted

in a reversal of the conviction, or an order for a new trial.'"

Commonwealth v. Sowell, 34 Mass. App. Ct. at 232; quoting Gray v.

Greer, 800 F. 2d 644, 646 (7th Cir. 1986.

15

The Sixth Amendment to the United States Constitution and
Article 12 of the Massachusetts Declaration of Rights guarantees
the right of a criminal defendant to effective assistance of
counsel at each critical stage of the proceedings. In
Commonwealth v. Saferian, 366 mass. 89, 96 (1974), the Supreme
Judicial Court established a two-part inquiry to determine the
constitutional adequacy of the legal assistance provided by
defense counsel: 1) whether "there has been serious incompetency,
inefficiency, or inattention of counsel-behavior of counsel
falling measurably below that which might be expected from an
ordinary fallible lawyer," and 2) whether "it has likely deprived
the defendant of an otherwise available, substantial ground of
defense." In other words, if "better work [by defense counsel]
might have accomplished something material for the defense" a new
trial should be ordered. Commonwealth v. Satterfield, 373 Mass.
109, 115 (1977); see also Commonwealth v. Tucceri, 412 Mass. 401,
413 (1992).

Applying the first Saferian criteria in the present case, it
is apparent that defense counsel's failure to object to the
court's two incorrect instructions regarding 'excessive use of
force in self-defense," constituted conduct that was measurably
below that which might be expected from an ordinarily fallible
lawyer. As noted above, these instructions were clear error.
Torres, 420 Mass at 488-89, because they require the mitigating
circumstances of excessive self-defense to be affirmatively
proven beyond a reasonable doubt as the prerequisite for

manslaughter. Therefore, since the jury did not have a clear and proper instruction on manslaughter, defense counsel's failure to object to the instruction has deprived the petitioner of an otherwise available, substantial ground of defense.

### B. Defense counsel failed to advance "provocation" as circumstance reducing murder to manslaughter.

The death in this case seems to present the very paradigm if a homicide that is at most manslaughter rather than murder, because it is committed in "hot blood" on reasonable provocation, and therefore without the "malice" which is the necessary element of murder. See Commonwealth v. Boucher, 403 Mass. 659, 661-662 (1989). In the classic formulation of Chief Justice Shaw in Commonwealth v. Webster:

> [I]f death, though willfully intended, was inflicted immediately after provocation given by the deceased, supposing that such provocation consisted of a blow or an assault, or other provocation on his part, which the law deems adequate to excite sudden and angry passion and create hear of blood, this fact rebuts the presumption of malice; but still, the homicide being unlawful, because a man is bound to curb his passions, is criminal, and is manslaughter.

> ... The true nature of manslaughter is, that it is homicide mitigated out of tenderness of the frailty of human nature. Evey man, when assailed with violence or great rudeness, is inspired with a sudden impluse of anger, which puts him upon resistance before time for cool reflection; an if, during that period, he attacks his assailant with a weapon likely to endanger life, and death ensues, it is regarded as done through the heat of blood or violence of anger, and not through malice, or that cold-blooded desire of revenge which more properly constitutes the feeling, emotion or passion of malice. Commonwealth v. Webster, 5 Cush. 295, 305-308 (1850)(emphasis added).

17

In this case, defense counsel's theory of defense was
astoundingly vague, if not non-existent. whether intentional or
not, an "all or nothing" strategy resulted. the courts have been
unwillingly to 'second guess competent lawyers working hard for
defendants who turn on them when the jury happen to find their
clients guilty. Commonwealth v. Stone, 366 Mass. 506, 517 (1974),
when "arguably reasoned tactical or strategic judgments of a
lawyer are called into question." Commonwealth v. Rondeau, 378
Mass. 408, 413 (1979). However, "there may be instances where the
judgment of fully informed counsel may be so manifestly
unreasonable as to be unprotected by the labels of 'trial
strategy' or 'trial tactics'." Commonwealth v. Adams, 374 Mass.
at 728 (1978). Herein, although the Court instructed the jury
correctly on "provocation" as reducing the crime from murder to
manslaughter [T.Tr. 3: 84-87], defense counsel never advanced the
theory of "provocation" to the jury. Given the facts of this
case, such a decision was so "manifestly unreasonable" in the
sense of Commonwealth v. Adams, 374 Mass. 722, 728-729 (1978), as
to constitute "ineffective assistance of counsel," because
"self-defense" and provocation" are not mutually exclusive;
rather they are "conceptually related." Boucher, 403 Mass. at
664. This point is made succiently elsewhere in the Boucher
opinion:

> Inherent in the petitioner's argument that he was not guilty
> because he has acted in self-defense was his reliance on

18

provocation to mitigate the charge of murder to manslaughter, if the self-defense claim were to fail. Id. at 663.

Although in closing argument defense counsel at best appeared to suggest self-defense to the jury, there was no evidence at trial that the victim was armed at the time of the confrontation. The facts in the present case mandated a strategy combining self-defense and provocation, but at minimum, the defense of provocation. Petitioner, as well as all other witnesses, testified that he walked away from Torres after the initial confrontation. Torres followed Petitioner shouting vulgarities. It was not until Torres "sucker punched" Petitioner, with the force of a six foot tall 220 pound man, that Petitioner stabbed Torres. Under the circumstances in this case, the strategy of only presenting a vague self-defense theory was manifestly unreasonable. Unfortunately, defense counsel's closing argument echoed his earlier plea to the trial court when "arguing" for a required finding:

MR. VESPERI:    I'm obviously asking for manslaughter at this point. I mean, I'm talking about--you've heard everything probably better than we have.

THE COURT:     Well, I don't have the right to do that.

MR. SULLIVAN:  Judge Steele tried to do that.

THE COURT:     It's hazardous to your health.

MR. VESPERI:    You have a lot of courage, your honor, I have great faith in you. You're going to retire in a year anyway, so you can do it.

19

THE COURT:       The record is going to get me in trouble and
                 you too. I think there's sufficient evidence
                 that well satisfies the Latimore standard.
                 It's a jury issue.

MR. VESPERI:     <u>Maybe you can knock it down to second?</u>

THE COURT:       I can't do that. So, I'm going to deny it,
                 and I'm going to place on the record your
                 objection to my action and deny your motion
                 at the close of the Commonwealth's case.

(Tr. 2: 112-13)(emphasis added).

MR. VESPERI:     <u>Do you think you could see it to make it a
                 manslaughter right now to go to the jury? It
                 is a 20-year felony.</u>

(Tr. 2:207)(emphasis added). "Give him a break" is not an

effective defense. Nowhere in his closing argument did defense

counsel employ the term self-defense nor did he articulate any

facts that conformed to a self-defense theory that Gilmore used

excessive force in self-defense, i.e., it was manslaughter, not

murder.

In applying the second <u>Saferian</u> test, the Supreme Judicial

Court has looked to whether the counsel's incompetence has led to

loss of "an otherwise available substantial defense." <u>Rondeau</u>,

378 Mass. at 413. In the present case, the opportunity to have

the jury consider that the petitioner was guilty of only

manslaughter rather than murder clearly deprived the petitioner

of his only viable defense. Therefore, since no "provocation"

theory was put by the defense to the jury, a new trial must be

20

granted on the basis of ineffective assistance of counsel in the
"failure of counsel to pursue 'an otherwise available,
substantial ground of defense'." Commonwealth v. Gelpi, 416 Mass.
729, 730 (1994), quoting from Saferian, 366 Mass. 96.

### C. Trial Counsel failed to object to the improper testimony evoking sympathy for the victim.

Trial counsel provided ineffective assistance of counsel in
failing to object to the testimony of the "victim"'s  brother in
its entirety. See Commonwealth v. Gillette, 33 Mass. App. Ct.
427, 429-432 (1992), and in failing to object to the prosecutor's
repeated mis-characterization of the victim as a "kid," both of
which also improperly evoked sympathy for the deceased. See
Commonwealth v. Gordon, 422 Mass. 186, 830-31 (1996).

Although the petitioner avers that each and every failure by
petitioner's trial counsel, as described in Argument II, A-D, is
in and of itself sufficient to prove ineffective assistance of
counsel, certainly taken as a whole, the failures constitute
ineffective assistance of counsel.

### D. Trial counsel's decision to use Christina Arsenault as a defense witness was manifestly unreasonable.

Trial counsel approached the decision to call Christina
Arsenault as a witness in the same haphazard manner that he
addressed other aspects of the trial. Christina's testimony did

21

little other than discredit the petitioner's testimony; any corroboration she offered the petitioner's version of events had largely, if not totally, been elicited from other witnesses. First and foremost, the prosecutor elicited from Christina that she had repeatedly lied to the police about the Petitioner's whereabouts after the stabbing and aided him while he was a fugitive, which was known to defense counsel in advance, and strongly implied that she was no doubt still lying as a witness to help her lover. Defense counsel's only attempt to retain Christina's credibility was in closing arguments, "[s]he told you she likes him [petitioner] and she wants to help him, but she wasn't going to fabricate for you." (T.Tr. 3: 20).  On cross-examination, any help she offered the defense was eviscerated by her concession that although she had described the incident on direct examination, in fact she did not see crucial details of what  had transpired (T.Tr. 2: 145, 151-153).

Christina's testimony not only hurt the credibility of the petitioner's testimony, but in fact helped undermine both any theory of self-defense, no matter how incompletely it was presented, and the unused provocation defense. Christina testified that she was standing five feet away from Petitioner and Torres when Torres hit Petitioner, yet claimed she did not see or hear the sound of the punch landing. She also implied that Petitioner had an escape route and said that he did not appear to be frightened of Torres.

22

Trial counsel felt the need to justify his obvious mistake of calling Christina (who curiously, he calls both Cheryl and Christina throughout his closing argument) as a witness:

> The biggest reason they (sic) put her on the witness stand is she is right there at the scene and that other fellow, Roberto Rivera, said she wasn't there. Whatever you think about Christina Arsenault -- You may not like her. The minute she broke into the other fellow's house to steal a dog -- whatever else we feel about her, wasn't she there loading the laundry in that car? She was there along with her mother, and Rivera said they weren't there. ( T.Tr. 3: 31).

However, the notion that putting a manifestly incredible witness on the stand, apparently without any real consideration of what she would say, simply to impeach Rivera (who presumably focused on the fight, not on who was a bystander) on the minor point that he had not seen Christina at the scene, is absurd, particularly since all other witnesses made clear that she was present and that she drove petitioner from the scene. Additionally, as trial counsel acknowledged, Rivera was already impeached on this point by his failure to see Debra Vodden either (T.Tr. 3: 19-20). Counsel had to concede that Christina was not a good witness:

> She [Christina] may not have been the most desirable witness but she was a witness and I used her. If i could pick the greatest people in the world to go on the witness stand it would be great but I don't pick the people. And she was there and I put her on. (T.Tr. 3: 30)

23

and conceded that he did not know what she was going to say prior
to calling her as a witness:

> For some reason I kept asking him (Roberto Rivera) did you
> see Debra Vodden there? We've already seen Debra Arsenault
> (sic) testify. I didn't even know what Cheryl (sic)
> Arsenault's testimony was going to be. I felt they were
> there and I wanted to know if he saw them and so forth.
> (T.Tr. 3: 19-20) (emphasis added).

By his other ineffective actions outlined above and below,
trial counsel reduced his options to grounding his defense on
asking the jury to disbelieve Rivera entirely because Rivera did
not see that Christina was present, an absurdity exploited by the
prosecutor in his closing (T.Tr. 3: 89-39; 44-45). The decision
to use Christina as a defense witness simply because "she was
there" was manifestly unreasonable and deprived the petitioner of
an otherwise available, substantial ground of defense.

In sum, the petitioner was both presumptively and actually
prejudiced by the collectively effective assistance of counsel,
and as set out under the Court's holding in <u>Strickland</u>, he is
clearly entitled to relief.

### III. WHETHER THE PETITIONER IS ENTITLED TO RELIEF UNDER 28 U.S.C. § 2254, BECAUSE THE PROSECUTION STATEMENTS OF SYMPATHY FOR THE VICTIM WAS HIGHLY IMPROPER.

In an effort to invoke sympathy for the victim, the
prosecutor turned a thief and a bully into an innocent "victim"
deserving of the jury's sympathy and pity. He did this
principally by presenting and exploiting the evidence of the
deceased's brother, who was not a percipient witness of any of

24

the events in question, and who had no relevant evidence to give
other than identification of the body. Although, not medically
qualified, the brother testified that the "victim" suffered from
epileptic seizures and repeated that he was "a nice person,
quiet," a "quiet person" who "stay[ed]. . . out of trouble"
(T.Tr. 2: 80-81). The brother testified to the pitiful and
distorted appearance of the "victim" in the hospital after the
stabbing, shortly before he died (T.Tr. 2: 82). Presenting this
testimony was highly improper, a transparent device to evoke
sympathy for the deceased, see id., and so effective for that
improper purpose that trial counsel needed to attempt some damage
control in argument:

> Pablo Torres testified. He is the brother of Enrique Torres.
> He identified the body at the hospital. It was very
> dramatic. His testimony was very dramatic, and I said from
> the beginning this is a tragedy. This man died, Enrique
> Torres. It's probably more of a tragedy for Pablo Torres.
> (T.Tr. 3: 27)

Trial counsel then conceded that the deceased "may have been
a nice guy" even though he may have stolen the bike and had a
terrible confrontation, "[c]ertainly Pablo Torres thinks so"
(T.Tr. 3: 27). Trial counsel's only recourse was to say that
Petitioner was a nice guy too. He later repeated that Torres'
death was a "tragedy," and called on God to bless him (T.Tr. 3:
34). The prosecutor amplified the effect of the sympathy-inducing
testimony of the "victim's" brother by referring, in his cross
examination of the petitioner, without objection by trial
counsel, seven times to the term "victim" as a "Spanish kid" or

25

"the kid" or "this kid" (T.Tr. 2: 188, 192, 194 (twice), 2: 197, 202, 204). This prejudicial characterization was totally unwarranted by the evidence; the "victim" was a burly 28 year old man, 5'11" tall, weighing 220 pounds (T.Tr. 3: 31-32); the petitioner was 18 years old, 5'10" tall, and weighing maybe 160 pounds (T.Tr. 1: 102).

The prosecutor has a particular obligation not only to argue the Commonwealth's case forcefully and aggressively, but also to do so in a way that states the evidence clearly and fairly and inspires confidence that the verdict was reached based on the evidence rather than sympathy for the victim and his family. See Commonwealth v. Shelly, 374 Mass. 466, 472, 373 N.E. 2d 951 (1978), citing Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); also see Commonwealth v. Santiago, 425 Mass. 491 (1997).

Viewing the prosecutor's argument and comments in the contexts of the trial as a whole, petitioner is entitled to relief.

IV. **WHETHER THE PETITIONER IS ENTITLED TO RELIEF UNDER 28 U.S.C.
§ 2254, BECAUSE HIS CONVICTION WAS OBTAINED BY THE
UNCONSTITUTIONAL FAILURE OF THE PROSECUTION TO DISCLOSE TO
THE PETITIONER, EVIDENCE FAVORABLE TO THE PETITIONER.**

Statutory construction requires examining the language of
the statute as a whole, not taking separate sections out of
context:"[a] statute should be read as a whole to produce an
internal consistency." Telesetsky v. Wright, 395 Mass. 868, 873
(1985); also Flynn v. Connors, 39 Mass. App. 365 (1995) (the
phrase "a sum for past support" must be read in conjunction with
the general intent of statute to provide for current support of
dependent children). Once the Grand Jury returns a true bill, the
need for secrecy ends, and any order of impoundment should be
vacated. The remainder of the immunity statute has no provisions
relating to secrecy. M.G.L. c. 233, § 20C-20I. By operation of §
20E, the transcript of the immunity hearing necessarily should be
available to the petitioner as mandatory discovery, i.e., as the
statement of "a person who has testified before a grand jury,"
Mass. R. Crim. P. 14 (a)(1)(B), and as a Grand Jury exhibit.
Mass.R.Crim.P. 14(a)(1).

The prosecution refused to allow the petitioner's defense
access to the transcripts and sought a protective order to that
effect. A witness may be given immunity only if the evidence he
possess "might tend to incriminate him." M.G.L. c. 233, § 20E.
Consequently, Massachusetts recognizes that the testimony of an
immunized witness is suspect:

> No defendant in any criminal proceeding shall be convicted
> solely on the testimony of, or the evidence produced by, a
> person granted immunity under the provisions of Section 20E.

M.G.L. c. 233, § 20I. The testimony of an informer who provides

evidence against a defendant in exchange for immunity from

punishment for criminal conduct must be examined and weighed by

the jury with greater care than the testimony of an ordinary

witness. The jury must determine whether the informer's testimony

has been affected by his or her self-interest or by prejudice

against the petitioner. See Commonwealth v. Andrews, 403 Mass.

441, 458 (1988) (an accomplice's testimony should be regarded

with "close scrutiny"); Devitt and Blackmar et al, Federal Jury

Practice and Instructions, Vol. 1, § 15.03 (4th Ed. 1992).  Since

an immunized witness may be especially likely to fabricate

testimony at trial, or tailor his testimony to please the

government, it is particularly important that the petitioner had

access to all documents relating to the witness's credibility.

Information that may be used to "challeng[e] the credibility

of a key prosecution witness" is exculpatory and must be turned

over to the defendant. Commonwealth v. Ellison, 376 Mass. 1, 22

(1978); see Brady v. Maryland, 373 U.S. 83, 87 (1963);

Commonwealth v. St. Germain, 381 Mass. 256, 262 (1980). Even if

the information is privileged or confidential, it is admissible

to impeach the witness. Davis v. Alaska, 415 U.S. 308 (1974).

The defendant also has a right to all information bearing on

the witness's bias:

> The strong policy of our law is to recognize a right in a
> defendant to bring the possibility of bias to the jury's
> attention.

Commonwealth v. Fetzer, 19 Mass. App. Ct. 1024, 1025 (1985);

Sixth Amendment, U.S. Constitution Article 12 of the

Massachusetts Declaration of Rights; Davis, 415 U.S. at 315-318;

Commonwealth v. Graziano, 368 Mass. 325 (1975); Commonwealth v.

Henson, 394 Mass. 584, 587 (1985)("when a possibility of bias

exists...even if remote, the evidence is for the jury to hear and

evaluate").

Without the application of immunity and any other document

pertaining to the witness's immunity hearing, a petitioner cannot

fully explore the question of whether the offer of immunity

skewed the witness's testimony in favor of the prosecution:

> In some cases, circumstances are present that make a
> witness's invocation of the privilege and subsequent grant
> of immunity ripe for impeachment purposes. In certain
> circumstances, invocation of the privilege and a subsequent
> grant of government bear directly on the witness's
> credibility. Commonwealth v. Voisine, 414 Mass. 772, 785-786
> (1993).

In the case at hand, the Commonwealth had an obligation to

provide the impounded documents to the petitioner. Therefore,

deprived the petitioner to the evidence of testimony under Kyles,

115 S.Ct. at 1569-71; Brady, 373 U.S. at 87. Certainly, if the

Commonwealth's witness (Grinnell) were promised immunity or

believed that his cooperation would lead to immunity, this should

have been divulged to the petitioner as exculpatory evidence. See

Alford v. United States, 905 U.S. 150 (1972).

The bias of our Court system is in favor of openness, not the secrecy of the Star Chamber, impounding these documents is not necessary to protect the interests of the witness, since the immunity shelters him from prosecution. Continuing the impoundment after the Grand Jury has acted likewise serves no protected interest of the Commonwealth. The Order of the Impoundment serves only to penalize the petitioner by improperly denying him access to the facts surrounding the immunity grant and the statements of the immunized witness, which in this case, constitute exculpatory evidence.

In sum, the petitioner was denied access to exculpatory evidenced which prejudiced his defense, as unreasonable to established Court's findings, clearly the Petitioner is entitled to relief.

### CONCLUSION

For all of the foregoing reasons, this Honorable Court should grant the Petition for Habeas Corpus.

Respectfully submitted,

Dated: 4/21/05

Roderick Gilmore
P.O. Box 43
Norfolk, MA 02056

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was mailed R. Ravitz, AAG, at One Ashburton Place, Boston, MA 02108, on April 21, 2005.

Roderick Gilmore

Dated: 4/21/05